# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * *
ALISHA N. PANKIW,                *
                                 *      No. 15-1082V
                Petitioner,      *      Special Master Christian J. Moran
                                 *
v.                               *      Filed: March 21, 2017
                                 *
SECRETARY OF HEALTH              *      Findings of Fact, Onset of Joint
AND HUMAN SERVICES,              *      Pain.
                                 *
                Respondent.      *
* * * * * * * * * * * * * * * * * * * *
```

Ryan M. Spahr, Spahr Law Office, Indianapolis, IN, for petitioner;
Sarah Duncan, United States Dep't of Justice, Washington, DC, for respondent.

## FINDINGS OF FACT[1]

　　Alisha Pankiw alleges that an influenza ("flu") vaccine caused her to suffer joint pain.  Although the parties agree about some aspects of her medical history, the parties dispute when she began having joint pain.  These Findings of Fact attempt to resolve the outstanding factual disputes.

　　The parties agree that on March 20, 2012, Ms. Pankiw, who was working as a nurse, gave birth to a daughter, K.P.[2]  Tr. 50, 271.  On September 28, 2012, Ms. Pankiw received a dose of flu vaccine.  Exhibit 2 at 1.  Ms. Pankiw saw Dr. Heisel

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this ruling on its website.  Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4).  Any redactions ordered by the special master will appear in the document posted on the website.

[2] The girl's name has been redacted to initials.

on October 10, 2012, during which she reported symptoms consistent with arthritis.[3]  Exhibit 6 at 5.

The parties disagree about the onset of Ms. Pankiw's knee/joint problems. Ms. Pankiw contends that she first experienced these problems one to five days post vaccination.  Tr. 107-12; see also Tr. 307.  The Secretary suggests that onset was before the flu vaccine, possibly shortly after K.P. was born.  The Secretary relied upon histories Ms. Pankiw gave to doctors in the latter part of 2012, especially Dr. Heisel.

A hearing was held to resolve this dispute.  Witnesses were Ms. Pankiw, Ms. Pankiw's husband, Ms. Pankiw's mother, and Ms. Pankiw's friend.  Their testimony plus the information contained in all the documentary evidence is the basis for the findings of fact made below.

## Standards for Adjudication

The standards for resolving findings of fact are sufficiently established that they need not be repeated here.  For a detailed account, see Bayless v. Sec'y of Health & Human Servs., No. 08-679V, 2015 WL 638197, at *2 (Fed. Cl. Spec. Mstr. Jan. 15, 2015).

## Analysis

The analysis begins with a short explanation of why the records from Dr. Heisel do not persuasively establish an onset of Ms. Pankiw's joint pain.  The remaining paragraphs discuss the more persuasive records and testimony.

The Secretary, in asserting that the onset of Ms. Pankiw's joint problem is unclear, primarily relies upon records from Dr. Heisel.  Resp't's Rep. at 11-12. But, with respect to Ms. Pankiw's history, Dr. Heisel is not entirely consistent. The history of present illness in Dr. Heisel's first report from October 10, 2012 states: "Pain onset 4 mo ago 2 months post partum.  Location is initially hands back and feet.  That went away.  R ankle K [sic] knee L middle toe R index finger. No other joints."  Exhibit 6 at 4.  Dr. Heisel created his second report less than one week later.  In the October 15, 2012 report, he stated "Onset about a month ago."

---

[3] The parties seem to agree that medical records that memorialize Ms. Pankiw's present condition accurately state her health at the time the doctor created the record.

2

Thus, it appears that Dr. Heisel suggests 3 different dates of onset.[4]  Id. at 22.  The inconsistency in histories Dr. Heisel recorded lessens the evidentiary value of these reports.

Records created closer in time to the events that Ms. Pankiw is describing appear more accurate.  Following K.P.'s birth, Ms. Pankiw experienced swollen hands and feet.  Tr. 53.  By Ms. Pankiw's account, the duration was less than one month and when Ms. Pankiw returned to her OB-GYN (Dr. Linn), she did not report any swelling.  Exhibit 15 at 76; Tr. 56, 304.  Likewise, after giving birth, Ms. Pankiw felt weak and Ms. Pankiw attributed this weakness to prolonged bedrest during her pregnancy.  Tr. 159; see also Tr. 36-38 (describing bed rest), 44 (same), 47 (same).

Also, within a month of K.P.'s birth, Ms. Pankiw sought attention from a chiropractor at Apex Therapy Clinic.  She reported low back pain that resolved within two visits and mid back pain that did not immediately resolve.  Exhibit 35 at 5.

Any lingering mid back pain did not last long.  After the April 24, 2012 Apex Therapy visit, Ms. Pankiw did not return until October 22, 2012.  Exhibit 35 at 6.  Presumably, if Ms. Pankiw were hurting, she would have sought more treatment.  It is not likely that Ms. Pankiw was experiencing a significant amount of pain because she increased her level of activity after April 2012.  In May 2012, her participation in a program to become a nurse practitioner rose from less than half-time to more than half-time. Exhibit 32 at 1.  She began her clinical placements, working approximately 20 hours per week.  Tr. 225; see also Tr. 61, 66.

In addition to her educational activities, Ms. Pankiw cared for K.P. and her two stepchildren.  Ms. Pankiw regularly walked around her neighborhood with friends, went to the zoo, and brought her children to a swimming pool.  Exhibits 23, 24, 26; Tr. 67-72, 249, 276.  Her activity level suggests that she was not experiencing any significant joint pain.

According to her husband, Ms. Pankiw's state of general good health is reflected in their decision to purchase plane tickets to attend a family member's

---

[4] First, the onset could be "four months" before the October 10, 2012 visit, which would be June 10, 2012.  Second, the onset could be "2 months postpartum," which would be May 22, 2012.  Third, the onset could be "about a month" before the October 15, 2012 visit, which would be September 15, 2012.

Case 1:15-vv-01082-UNJ   Document 56   Filed 04/17/17   Page 4 of 7

wedding in Puerto Rico.  A credit card invoice showed that the family purchased the airfare on July 23, 2011.  Exhibit 23.  Mr. Pankiw persuasively explained that his wife and he believed that they had adjusted to having K.P. and felt comfortable planning a vacation that would include physical activities such as zip lining.  Tr. 279, 289.

At the postpartum April 27, 2012 appointment, Dr. Linn had recommended that Ms. Pankiw have her next appointment in three months.  Exhibit 15 at 76. This follow-up occurred on August 3, 2012.  Exhibit 15 at 85; Tr. 82, 227.  In Dr. Linn's review of symptoms, Dr. Linn recorded for musculoskeletal: "Negative for myalgias and arthralgias."  Exhibit 15 at 85.  Similarly, Dr. Linn's physical exam for musculoskeletal stated: "She exhibits no edema."  Id. at 87.  Dr. Linn ordered a routine set of labs that showed Ms. Pankiw's TSH was low.  Exhibit 15 at 92.

During her hearing testimony, Ms. Pankiw did not recall how Dr. Linn responded to the lab results.  Regardless, after these laboratory tests, Ms. Pankiw saw Dr. Rogers on August 24, 2011 to establish care with a new primary care physician.  Exhibit 37 at 8; Tr. 96.  In the review of symptoms that Dr. Rogers created, the entry for musculoskeletal system states: "Negative for back pain and arthralgias."  Exhibit 37 at 8.  Dr. Rogers's notes about her physical exam do not contain any information about the musculoskeletal system.

Following the August 24, 2012 visit with Dr. Rogers, the picture of Ms. Pankiw's health becomes less clear.  A record created in November 2012 states: "In late August/early September she developed joint symptoms."  Exhibit 36 at 9. Dr. Heisel's second report, dated October 22, 2012, suggests a similar onset: "Pain is increased in L knee… Also more swelling… Onset about a month ago."  Exhibit 6 at 22.  A third doctor stated: "In September, she developed generalized asymmetrical arthralgias.  Over the next few weeks, the arthralgias turned to frank arthritis of her left knee, right ankle, and wrist."  Exhibit 9 at 43 (Dr. Slama's December 18, 2012 report).

However, on September 17, 2012, Ms. Pankiw saw an endocrinologist, Ernest O. Asamoah.  Exhibit 16.1 at 7; Tr. 97.  In the review of systems, the report for musculoskeletal stated: "Negative for back pain, joint swelling and arthralgias." Id. at 8.  Dr. Asamoah's note from physical exam states "Normal range of motion" in her musculoskeletal system.  Id. at 9.

Besides the lack of a report of joint problems to Dr. Asamoah, other evidence suggests that Ms. Pankiw was not having joint pain in September 2012.

4

She returned to working in a hospital as a floor nurse.  Tr. 92, 230.  Ms. Pankiw brought K.P. to a play date with another infant.  Exhibit 27; Tr. 15, 93.

In sum, before the flu vaccination, Ms. Pankiw was reasonably healthy and was active.  Any problems in her joints were not so pronounced that they interfered with her typical duties.

On Friday, September 28, 2012, Ms. Pankiw received the flu vaccine. Exhibit 21.  There is no dispute about this event.

The time and attendance records Ms. Pankiw's employer created show that on the following day, Ms. Pankiw worked an extra shift.  Exhibit 33 at 62.  Ms. Pankiw explained that her employer needed to maintain adequate nursing coverage and, therefore, offered a very high hourly wage as an incentive for her to work extra.  If Ms. Pankiw were in pain, she would not have accepted this additional assignment.  Tr. 107-12, 308-10.

According to a calendar kept on Ms. Pankiw's phone, she interviewed for a job as a nurse practitioner on Wednesday, October 3, 2012.  Ms. Pankiw credibly testified that in preparing for his interview she was concerned about appearing hobbled.  Tr. 114-15, 211-12, 243-44, 308.

Two days later, on October 5, 2012, she had an interview for another job. Ms. Pankiw again persuasively testified that by October 5, 2012, she could not hide her limp.  Id.

On October 10, 2012, she had her first of three appointments with Dr. Heisel.  As explained earlier, Dr. Heisel's medical histories are not accurate with respect to the history (onset of pain in her back and feet 4 months ago).  However, there is no reason to question the accuracy of Ms. Pankiw's report to Dr. Heisel about her condition on October 10, 2012.  She was having sharp pain in her right ankle and her left knee was swollen and achy.  She felt stiff all day.  Exhibit 6 at 4. There is also no reason to question the accuracy of what Dr. Heisel reported finding on his physical exam:  "Patient exhibits no edema.  I don't appreciate any warmth or effusion of the left knee.  There is a little warmth at the right ankle.  I don't appreciate any inflammation in her fingers or toes."  Id. at 5.

On Saturday, October 13, 2013, Ms. Pankiw's family, including her mother, visited a local orchard.  (The date is recorded on a picture taken during the outing.) During this trip, Ms. Pankiw had difficulty walking with the other members of her group.  Exhibit 29; Tr. 137, 209, 254, 288.

The next day, a Sunday, was the date of a birthday party for Ms. Pankiw's step-daughter.  During this party, one of Ms. Pankiw's friends noticed that she was not moving very easily and offered her crutches.  Mr. Pankiw recalled this birthday party as a time when the extent of his wife's joint problems was evident.  Exhibit 25; Tr. 138, 282, 311.

Ms. Pankiw had her second visit with Dr. Heisel on Monday, October 15, 2012.  Again, although Dr. Heisel's history is not accurate, the information that he recorded about Ms. Pankiw's present condition is reliable.  "Pain is increased in L knee. . . . It has gotten worse recently."  Exhibit 6 at 22.  Dr. Heisel also commented:  "Since she has more swelling and much more stiffness, requiring walking on crutches, I suggested a steroid injection."  Id.

Other evidence also shows that Ms. Pankiw's activity level changed.  On October 15, 2012, Ms. Pankiw canceled her shift as a nurse at the hospital.  Tr. 117.  The hospital's time and attendance records show that Ms. Pankiw's last shift at the hospital was on October 23, 2012, when she attended an educational course.  Exhibit 31 at 1; Tr. 117.

Ms. Pankiw also attended two weddings on crutches.  The first appears to have been relatively close to her residence.  See Tr. 141, 252.  The other wedding was in Puerto Rico.  Exhibit 28; exhibit 30 (Facebook postings) at 3; Tr. 141, 252, 288.

Following these weddings, Ms. Pankiw saw a variety of doctors, including her obstetrician for another pregnancy.  It appears that the information about Ms. Pankiw's current condition as recorded in the records from these doctors is accurate.  The parties have not indicated that factual findings are needed for Ms. Pankiw's medical history after November 2012.

## Conclusion

Ms. Pankiw has established that her joint pain began on approximately October 1, 2012.  This date is after she worked a double shift and before she had a job interview on October 3, 2012.

The parties are ordered to provide these findings of fact to any expert whom they retain to testify.  Expert opinion inconsistent with these findings of fact is not likely to be persuasive.  See Burns v. Sec'y of Health & Human Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that the special master did not abuse his discretion in refraining from conducting a hearing when the petitioner's expert "based his opinion on facts not substantiated by the record"); Brooke Group Ltd. v. Brown &

Williamson Tobacco Corp., 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1376 n.6 (Fed. Cir. 1994) ("An expert opinion is no better than the soundness of the reasons supporting it."); see also Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1574 (Fed. Cir. 1993) (the assumption of an expert about the accuracy of a fact witness's testimony does not "substantiate" the fact witness's testimony).

A status conference is set, sua sponte, for **Tuesday, April 4, 2017 at 10:30 A.M. Eastern Time**.  The parties should be prepared to propose the next step in this case.

Any questions may be directed to my law clerk, Shannon Proctor, at (202) 357-6360.

**IT IS SO ORDERED.**

s/ Christian J. Moran
Christian J. Moran
Special Master

7